**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | | |
|---|---|---|
| **ANTONIO CARNEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:13-00132** |
| | ) | **JURY DEMAND** |
| **PENSKE TRUCK LEASING CO., L.P.,** | ) | |
| | ) | **Judge Haynes** |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Comes now Plaintiff, Antonio Carney, and responds in opposition to Defendant's Motion for Summary Judgment on the pleadings.

## I.     FACTUAL SUMMARY

Antonio Carney ("Plaintiff") was trained as a track mechanic in the Army. (Pltf Dep 30:15-17) Track vehicles include M1 tanks, M113 personnel carriers, Bradley Fighting Vehicles, M577, and M109 Howitzer. (Pltf Dep 31:14-19) He was trained to repair their Detroit diesel engines. (Pltf Dep 32:03-06) He was cross-trained in repairing trucks. (Pltf Dep 35:01-04) He learned how to repair the wheel trucks, too. (Pltf Dep 35:10-13) Most of their maintenance and repairs were engine-type issues. They didn't do any rebuilds. They just replaced what was broken. (Pltf Dep 35:19-24) They didn't try to diagnose. That wasn't their level of maintenance. They just replaced what they were told to replace. (Pltf Dep 36:03-06) They did some preventive maintenance ("PM") by their standards; their technical manual ("TM"). (Pltf Dep 36:12-16) After re-enlisting in March of 1991, he was stationed in Germany, where he was also a track mechanic. (Pltf Dep 41:04-10) That unit had more wheel vehicles

than track vehicles because it was field artillery. (Pltf Dep 41:17-19) He was discharged from the Army March 5, 1995. (Pltf Dep 42:10-12) After that, he did 2 years in the National Guard (Pltf Dep 44:10-12), spending one weekend a month repairing track vehicles, as needed. (Pltf Dep 45:23-46:06) In the National Guard, he was a track mechanic; got out of the National Guard in March of 1997. (Pltf Dep 44:02-12) In May 1997, Plaintiff went to work for Diesel Power in Nashville as a diesel pump technician, rebuilding diesel fuel pumps for various vehicles such as backhoes, school buses, agricultural tractors. (Pltf Dep 46:20-27:19) He never maintained any vehicles there. (Pltf Dep 63:01-02) Thereafter, having taken various non-mechanic positions, on May 20, 2009, he enrolled at Nashville Auto Diesel College. (Pltf Dep 62:09-19) The first 6 months, he was trained in basic computer knowledge, A/C, some electrical for basic components of the vehicle. (Pltf Dep 63:06-11) The computer and electrical he was training on was for both commercial and personal vehicles. They were totally different systems than what he worked on in the military. (Pltf Dep 64:03-14) After that, he learned the basic diesel engine. (Pltf Dep 63:12-14) In the Army, he didn't tear the engine down to rebuild rings, bearings, etc. (Pltf Dep 65:15-18) They trained him on those things at the College: basic knowledge of hands-on to tear down the engine, as well as training on the whole vehicle. (Pltf Dep 65:22-66:04) He trained on transmissions, brakes, A/C—all the electrical. (Pltf Dep 66:05-15) He graduated in August 2010, having attended full time. (Pltf Dep 66:19-24) He then worked for Palm Truck Repair, in La Vergne, TN, doing PM. He did minor repairs such as brakes and a little A/C work. (Pltf Dep 67:16-23) They also had a trailer shop, where he repaired a lot of the components like brakes and tires, as well as a little PM on their reefer. (Pltf Dep 67:24-68:03) He also worked on wheel seals. (Pltf Dep 68:10-11) He left Palm Truck in August 2011, to work at Ryder Rental and Leasing. (Pltf Dep 69:02-03; 10-11)

Ryder has Technician ("Tech") 1, 2, 3, and 4 positions. Tech 4 was the highest. Plaintiff was hired at Ryder as a Tech 2. (Pltf Dep 70:10-17) Tech 2s were a little more advanced than the Tech 1s, and so on. (Pltf Dep 71:04-10) Advancement was based on type of education. You had to go to the different schools to get advanced; it was also based on how many different ASE certification tests you took. (Pltf Dep 71:11-19) Plaintiff has not taken any of those ASE tests. (Pltf Dep 71:22-25) ASE certifications are for specific areas of expertise within the repair field. (Pltf Dep 72:11-18) He was a Tech 2 his entire time at Ryder. (Pltf Dep 07-09) When he was first hired there, they sent him to a 2-day A/C class in Chattanooga. (Pltf Dep 82:02-05; 11-13) From there, he was sent to school for a 2-day class in La Vergne, to learn the computer diagnostic on International trucks. (Pltf Dep 83:16-19) The diagnostic software for those trucks is harder to understand than any other. (Pltf Dep 82:11-14) After that, he was sent for 5 days to a PM school in Memphis. (Pltf Dep 82:18-20)

When he was hired at Ryder, the Tech 1 was not yet hired, so he had to do pretty much all their PM. Once the Tech 1 was hired, they moved Plaintiff on to do other maintenance. He worked on a lot of tractors, Freightliners, and some Internationals. He did more PM on light-duty trucks than anything. He didn't do a lot of repair; the higher techs did those. He did a lot of brakes and A/C work. (Pltf Dep 73:16-74:11) He did brakes on mostly heavy-duty trucks: the 18-wheelers. (Pltf Dep 74:12-19) About 50 percent of his time at Ryder was spent working on brakes. They wore out quite a bit, and they did a lot of brakes. (Pltf Dep 127:22-128:04) <u>At Ryder, the higher techs assisted him on a lot of the work. If he had an issue, or needed help, he could always go to a higher tech and they would help him.</u> (Pltf Dep 75:10-20) <u>It was common among the higher techs to help any of the lower techs.</u> (Pltf Dep 76:14-15) He left Ryder in March of 2012, because of an opportunity for higher pay at Penske ("Defendant"). (Pltf Dep

76:24-77: 01)  He was never disciplined for anything at Ryder.  (Pltf Dep 77:12-14)  He had no complaints about how Ryder management treated him.  (Pltf Dep 80:11-15)

He applied online for the position with Defendant.  (Pltf Dep 107:08-12)  He was called in for an interview with Jeff Taylor ("Taylor"), Service Manager; Wendell Mielke ("Mielke"), District Service Manager, and Derek Jordan ("Jordan"), Day-Shift Shop Supervisor.  (Pltf Dep 107:22-108:13; Mielke Dep 04:25-05:01)  Jordan reported to Taylor.  (Pltf Dep 108:14-15)  Mielke is the only one who asked questions.  (Pltf Dep 108:20-21)  He looked over Plaintiff's resume and said he liked what he saw.  (Pltf Dep 118:06-07)  Mielke had no concerns about hiring Plaintiff.  (Mielke Dep 06:05-07)  They liked his application, his background.  There were two positions:  one of which—for a Tech 3—was open at that time; the other—for a Tech 2— wasn't quite open yet.  That tech was getting ready to retire, and Plaintiff had a choice between the two positions.  (Pltf Dep 109:14-24)

To Plaintiff, at the time of his hire, the Tech 2 position wasn't really a more experienced position; it was more of a job title.  At the Tech 2 position you did PMs, also.  Tech 2 was a little bit more advanced than the Tech 3, but not a whole lot.  (Pltf Dep 110:05-18)  It was the opposite of the way it was at Ryder.  (Pltf Dep 110:19-21)  They didn't really describe the duties of the Tech 2 position.  They asked Plaintiff if he wanted to take the Tech 3 position or wait and take the Tech 2.  (Pltf Dep 111:09-21)  The interview lasted about 10 minutes.   (Pltf Dep 118:08-09)  He did not have to answer any substantive questions about the work he would be doing.  (Pltf Dep 118:12-15)  They told him they don't do rebuild there at the shop, and that he would basically just do maybe A/C, replace brakes, probably some PM work.  (Pltf Dep 118:16-21)  He told them that's pretty much the same line of work he did at Ryder.  (Pltf Dep 118:24-119:01)  Incredibly, none of them—not Taylor, or Mielke, or Jordan—asked him any questions to kind of

test his knowledge as far as the Tech 2 or Tech 3 position went. They didn't test his knowledge any. (Pltf Dep 119:17-24) He did not fill out a written questionnaire with substantive questions about PM and how he would repair brakes or other parts of the car. (Pltf Dep 119:25-120:05)

When asked in deposition how he knew the difference between the two positions, he testified he knew they were sort of similar with Ryder, but it wasn't a higher tech level. (Pltf Dep 111:22-112:03) There were three tech levels at Defendant, but four at Ryder, so Plaintiff guesstimated that Tech 2 was almost the same tech level that Ryder was. (Pltf Dep 112:03-07) Further, the Tech 3 position didn't pay as much as Tech 2. Plaintiff had done the Tech 2 position at Ryder; so he said he would fall under that Tech 2 and would wait and do it. (Pltf Dep 112:09-14) Unbelievably, the job duties were not explained to him, and he mistakenly assumed that a Tech 2 is a Tech 2 is a Tech 2.

He saw the job descriptions for the two positions online, before he interviewed. (Pltf Dep 112:15-24) That's what he based his knowledge of the positions' duties on. At the Tech 2 position, you get assistance by the Tech 1, which is a higher level tech. He knew if he could go into there as a Tech 2, he still needed training. He wanted that Tech 2 position, and knew there would be a Tech 1 that would help him along as a Tech 2, to be able to better advance himself. (Pltf Dep 113:02-19) He did not know anyone who already worked at Penske. (Pltf Dep 113:20-22) This is perhaps the crux of the issue, right here. He obviously assumed that Defendant's management philosophy matched Ryder's, and that the help of a Tech 1 would be available to enable him to succeed and advance.

In his interview, Plaintiff did not talk about thinking he could do the Tech 2 position and having a Tech 1 to assist him if he needed help or additional training. None of that was discussed in the interview. (Pltf Dep 114:04-13) It was Plaintiff's understanding that with

Defendant, as a Tech 2, he would perform PM, and if there weren't PM, there was other required maintenance repair—not a lot of big repairs, but basic repairs, like brakes. (Pltf Dep 115:01-09) At that time, his understanding was pretty much that he would maybe repair a lot of tires and maybe do A/C work. (Pltf Dep115:10-13) His understanding of the relationship among Tech 1s, 2s, 3s, and the supervisors was that the Tech 1 would basically assist the Tech 2 if there were any type of troubleshooting problems. If you had any question, you could go to a Tech 1 or their Lead Tech, to assist you in the jobs. (Pltf Dep 115:14-116:05) He based that understanding on the job description he saw on the Internet. (Pltf Dep 116:06-13) A Tech 2 would basically get assistance from a Tech 1. (Pltf Dep 116:17-19) He never saw the Tech 1 job description. (Pltf Dep 116:23-117:01) When he was hired, Defendant had a Tech 1—Tommy Stiltner ("Stiltner"), who was Lead Tech, and his job was to go around and inspect any jobs that they did, whether they did it right or whether they put all the parts together and where they're supposed to be, and just basically inspect the work after they got done. (Pltf Dep117:02-13)

Plaintiff has no knowledge of the difference between outboard and inboard brakes. (Pltf Dep 124:03-06) He had never worked on an outboard brake system, including his time in the military. (Pltf Dep 115:18-23) He had never worked on an inboard brake system, either. (Pltf Dep 126:06-08) He does not know the difference between the two. (Pltf Dep 126:24-25) He had no discussions about braking systems during his interview with Defendant. (Pltf Dep 127:13-16) Hardly any of his time with Defendant was spent doing brake systems. (Pltf Dep128:05-07) Other people were doing the brake work; a lot of them were Tech 1s: Stiltner, Egore Brooks ("Brooks"), and Dwight Claybrooks ("Claybrooks"). (Pltf Dep 128:13-22) Claybrooks was a Tech 2. (Pltf Dep 129:10-11) When hired by Defendant, Plaintiff replaced tires and maybe did some small light fixture repairs. He didn't do any A/C work. The majority

of it was PM. (Pltf Dep 129:13-23)  The shop supervisor, Joseph Kepler ("Kepler"), assigned his tasks. (Pltf Dep 130:04-12)  Kepler reported directly to Taylor; Plaintiff reported directly to Kepler. (Pltf Dep 130:17-22)  Plaintiff pretty much worked by himself, especially on a lot of the PM. Nobody assisted him. (Pltf Dep 131:13-16)

Claybrooks was the only other Tech 2. They had two Tech 1s and two Tech 3s. They all worked the same shift. (Pltf Dep 132:15-25)  Claybrooks did a little bit higher maintenance. Plaintiff saw him on a transmission job. He thought because Claybrooks had been there longer and pretty much knew Defendant's standards, he was doing a little bit higher work. (Pltf Dep 133:05-12)  Plaintiff never saw Claybrooks work on brakes. (Pltf Dep 133:14-16)  The Tech 3s were doing pretty much more PM. He never saw them doing maintenance on a transmission, but did see a Tech 3 replace a tire on a trailer. When there was no PM to be done, they let the Tech 3 do whatever jobs were available in the shop until a PM came in. (Pltf Dep 133:17-134:04)

The time each tech spends on a particular job is tracked based on Defendant's computer, but wasn't tracked based on their computer. (Pltf Dep 134:06-10)  They had three sets of computers in the shop. You logged in and they gave you the assigned job. (Pltf Dep 134:14-18)  They already put the job in the computer so you just looked up the repair order ("RO") and at that point, you put it in your log in and start working. (Pltf Dep134:20-135:02)  There was no set time at all based on our knowledge. (Pltf Dep 135:03-04)  When you finished the job, you went back to the computer and said, I'm done, and the clock would stop. (Pltf Dep 135:13-18)

Many times, Plaintiff had not logged out of the job; it could have been another tech needed help on something. (Pltf Dep 136:25-137:06)  Sometimes he had to stop and help someone; then come back to the job again. (Pltf Dep 137:11-14)  There really was no way you could note on there that you were logged into another job, helping another tech. (Pltf Dep

137:16-21)  Once the time starts, even though you can annotate it on there, they are looking at the times—not what you did during that time period.  (Pltf Dep 137:23-138:02)  Just because he would annotate a reason for being sidetracked, that wouldn't be an excuse of why it might have taken him so long to do that job.  (Pltf Dep 138:15-19)  If you did a PM, it required so much.  You clock in on the job; before you do the PM, you had to wash the truck.  Sometimes, even before washing the truck, you might have to go look for it.  Even though you were on the clock, you had to do all of that before you start PM.  (Pltf Dep 139:02-14)  If the wash bay was being used and you couldn't wash the truck at the time, you had to sit and wait.  (Pltf Dep 139:15-21)  If it took 2 hours to do a PM on the truck, you might spend 30 minutes looking for the truck.  Then you might spend an additional 30 to 45 minutes waiting for the wash bay before you even actually did a PM check.  (Pltf Dep 139:22-140:06)  Once you go in and annotate it, it doesn't do any good.  It's still considered inside that 2 hours.  (Pltf Dep 140:07-09)  Many times, he has had to spend 30 minutes prior to a PM check, finding the truck and waiting for it to be washed.  (Pltf Dep 140:10-13)  He's actually had times he had to look for keys; couldn't find the keys to the vehicle.  (Pltf Dep 140:15-17)  It could be half an hour, because there have been times he actually went to the shop supervisor and said, Look, do you have the keys to the truck?  I need to find the keys.  And when you find the key, then you have to go look for the truck.  (Pltf Dep 140:19-25)  It has taken him as much as 30 minutes to find the truck.  There are two parts to that shop:  one in the rear; one in the front.  So many trucks are in that area, you had to walk up and down to find it.  (Pltf Dep 141:01-14)  Once you did, you first had to wash it, based on their standards of PM.  (Pltf Dep 141:15-25)  Washing the truck would take maybe 5 to 10 minutes, but when it came to trying to get into the wash bay to wash the truck, it might take the longest, because they had to share the wash bay with people cleaning the trucks.  There could be a truck

sitting in the way, and they couldn't wash their trucks. The longest he ever had to wait for the wash bay to open was about 20 minutes. (Pltf Dep 142:03-14) If he spent a half hour finding the truck, he did not notate that in the annotation section for the job because he was never familiarized with the annotation area of the RO. He was just told to clock in on the job and do the work. (Pltf Dep 143:20-144:04) He was first told about the annotation section probably a month after being hired. That's when he was told to not annotate what was done: just annotate parts used, how much oil you had to put in, things like that. He was never told—was never aware that he should annotate what was done or what took so long. (Pltf Dep 144:05-17) Throughout the entire time he worked for Defendant, nobody ever told him he could annotate on the job that he had taken extra time to look for or wash the truck. (Pltf Dep 144:18-25) Even if he had annotated it, it wouldn't have mattered. (Pltf Dep 145:09-10)

He never had any discussions with Stiltner about, Hey, I spent half an hour looking for this truck so my time's going to be a little bit over. At that time, they never told them that. (Pltf Dep 146:06-13) Throughout his employ, he never was aware that they needed to go to their Lead Tech and tell them the amount of time. (Pltf Dep 146:15-18)

Taylor has been with Defendant for 15 years, and for the past year has been Working Maintenance Supervisor. Prior to that, for 1 year he was a Tech 1, and for the previous 5 years, was the Branch Service Manager. (Taylor Dep 05:04-19) At one point, he took a demotion, due to poor job performance: customer complaints, of which he [claims he] knows no specifics. (Taylor Dep 06:04-14) There are currently two employees in his shop: both are Caucasian. (Taylor Dep 06:24-07:03) After the hiring process, his only interaction with Plaintiff was during training and then, as issues arose, Kepler, would come to Taylor. (Taylor Dep 09:22-10:02)

On April 10, 2012, Plaintiff met with Taylor to discuss his PM times. (Pltf Dep 146:22-147:03) He had not previously talked with Taylor about performance times—even informally. (Pltf Dep 147:08-12) He was on the floor maybe 3 weeks, if you count the first week only being in orientation. After orientation, he had another 2 or 3 weeks, and that was prior to April 10 when he had his first meeting with Taylor. (Pltf Dep 147:22-148:03) The first 3 weeks he was out on the floor, the subject of the time he spent on the PM never came up. (Pltf Dep 148:04-08)

Taylor testified that the first time he heard any allegations of problems with Plaintiff was from Kepler, within Plaintiff's first 3 weeks of employment. (Taylor Dep 13:14-19) The complaint was poor job performance; specifically, jobs not being completed in a timely manner. (Taylor Dep 13:23-14:01) Excessive job times was really the only complaint on Plaintiff during the first 3 weeks. (Taylor Dep 14:04-08) Defendant's knee-jerk reaction to missed "projected" times of an employee on the job less than 1 month—projected times that were theretofore undisclosed to Plaintiff—was to issue a written disciplinary action, a Performance Improvement Plan ("PIP") that threatened termination. Defendant purportedly maintains "goal times" for each type of repair. Although a Tech is not required to meet the goal time for every repair, they are evaluated on their overall ability to perform their assigned tasks in the expected amount of time. (Def's Memo of Law, DE 18, 09/15/14, p. 2) Mielke testified that approximately 2 to 3 weeks after Plaintiff was hired, Mielke first heard from Taylor that Plaintiff was not meeting expectations. (Mielke Dep 11:24-12:04) Mielke could not recall if Taylor had indicated the source of that information. Mielke said he coached Taylor to be patient, observe, and understand that Plaintiff was a new employee. (Mielke Dep 12:09-14)

Taylor testified that after several discussions about job performance with Plaintiff, he felt it necessary to issue a written warning. (Taylor Dep 14:18-21) He does not recall if that was the April 10, 2012, meeting. (Taylor Dep 14:22-23)

At his April 10th meeting with Taylor and Mielke, they discussed his performance times on PM. (Pltf Dep 152:01-04) Mielke's first comment was, I'm just going to get to the point. Your job performance is poor and it needs a whole lot of improvement. Then Taylor started naming off some projected times. (Pltf Dep 152:10-18) The projected time for one heavy-duty truck was 2.2 hours; Plaintiff did it in 2.7. (Pltf Dep 152:20-23) Plaintiff said he didn't really know the times, because they aren't annotated in the computer. Then Mielke said, Well, only thing you need to do is get your ass out there and work on trucks and don't worry about projected times. (Pltf Dep 153:03-12) Taylor then said his projected times were not under their standards. (Pltf Dep 153:13-15) Plaintiff told them he was doing the best he could; he had only been there 3 weeks. He was trying to learn Defendant's standards as far as projected times; they were totally different from Ryder's. (Pltf Dep 153:17-21) He asked Taylor if he would put the projected times down so he would know them; Taylor said he would. (Pltf Dep 153:24-154:01) He gave Plaintiff the PIP and said it was for 30 days, and Plaintiff signed it. (Pltf Dep 154:02-05) Mielke testified that he recalls Plaintiff brought up some concerns about goal times at that meeting, saying he was trying to learn Defendant's system. (Mielke Dep 14:12-21) Mielke then left, and Plaintiff told Taylor he was really kind of surprised about that. He didn't want to get terminated over it. (Pltf Dep 154:05-10) Taylor said it was just one of those evaluation procedures they had and Plaintiff needn't worry about getting terminated. (Pltf Dep 154:11-14) Defendant would have the Court believe that Plaintiff simply admitted he exceeded goal times and his performance did not meet expectations. (Def's Memo of Law, DE 18, 09/15/14, p. 2)

What Plaintiff actually testified to was that after that meeting, he understood there were goal times for each type of PM. (Pltf Dep 154:16-19) He understood that his performance to that point had not been meeting those goal times, <u>because he didn't know the projected times</u>. (Pltf Dep 154:20-24) He knew nothing of those issues until that first meeting, on April 10th.

    After Plaintiff's orientation at Defendant, that first day, they gave him a truck to do PM on. He asked Jordan what was the (in Ryder vernacular) standard repair time ("SRT") to do that PM, and Jordan said, If you're talking about projected time, <u>we don't have projected time</u>. (Pltf Dep 155:13-156:01) <u>They took the projected time out about a year-and-a-half ago. It's no longer in the computer system.</u> (Pltf Dep 156:04-06) Plaintiff said, So that means I don't have to really try to focus on the projected times now, just go ahead and work on the truck? Jordan said, Well, yeah, that's true. But that's not saying you have to spend all day on the truck. They might say something. But no, <u>we don't have projected times</u>. (Pltf Dep 156:07-16) Projected times/goal times/estimated repair times are the estimated time it would take to complete a job on a vehicle. (Taylor Dep10:18-20) According to Taylor, those goal times are provided on the computer for the employees. (Taylor Dep 10:21-25) Also according to Taylor, each technician—no matter what their level—has access to those goal times on the computer. (Taylor Dep 11:01-03) They have not been provided on the computer the entire time Taylor has been at Defendant. He does not remember the exact dates or time periods they were not provided. (Taylor Dep 11:07-10) They were not available for 2 to 3 years. (Taylor Dep 11:19-21) They started being available again 2 years ago. (Taylor Dep 11:16-18) If the job Plaintiff was clocking in on, was loaded at that time, then he was able to access those projected times under which he was expected to work. Some of the jobs were being loaded back in the system. (Taylor Dep 12:04-14) According to Taylor, the projected times were taken away in the first

place because time standards and jobs have changed, with technology changes on the equipment. Defendant was gathering data to come up with the estimated time it would take to do a repair, based on every classification of a technician doing a job on every year make and model of truck. (Taylor Dep 12:18-24) Taylor does not recall what types of jobs had been loaded. (Taylor Dep 13:11-13) Plaintiff knew that it wasn't for him to sit and spend all day on a truck. It needed to be fixed. But as far as standard time in a lot of shops, even at Ryder, there is a projected time they go by. Defendant just didn't have it. (Pltf Dep 157:08-16) He did not understand that there were goal times—didn't even know they existed, because they took that out of the computer system. (Pltf Dep 159:04-09) If Plaintiff is guilty, it is of naivete. He believed it when he was told that there were no projected times.

At the April 10 meeting, Plaintiff told Taylor that he was still trying to learn their standards because they were different from Ryder's. As far as Ryder was concerned, they had SRT on their computer system. (Pltf Dep 160:06-17) He did not bring up the issues of PM taking longer because of looking for trucks because at that point—after Mielke told him to get his ass out there and work on trucks—he was speechless. (Pltf Dep 160:21-161:08) He didn't want to say anything because he was really surprised at the disciplinary action. (Pltf Dep 161:12-15) He and Taylor discussed that they would have weekly meetings and monitorings to track his performance going forward from April 10. (Pltf Dep 163:23-164:04)

He met with Taylor the next week about his PM times. Kepler was also there. (Pltf Dep 164:15-22) Taylor said his times were better, but needed a bit more improvement. They were going to stick with the 30-day PIP as required on the disciplinary action. (Pltf Dep 165:09-15) Taylor never showed him any other times that he went over. (Pltf Dep 165:18-22) He knew he had some occasions where he had PMs over the goals, but not as bad as they were before the

disciplinary action.  (Pltf Dep 166:08-13)  There was a second weekly follow-up meeting,

attended by Taylor and Kepler.  Taylor did most of the talking, saying that Plaintiff's projected

times were a lot better than they used to be.  Plaintiff said he was doing the best he could.  He

now knew what the times were, and now could improve.  (Pltf Dep 167:13-168:06)  But they

went from that subject, and Taylor started complaining, asking why Plaintiff hadn't worked

overtime that Saturday.  The Thursday before, Taylor had asked some of the diesel techs if they

could work overtime.  It wasn't mandatory.  He said he was asking for volunteers.  (Pltf Dep

168:07-14)  In the meeting, Plaintiff replied that it was not mandatory and he had family

business to take care of:  a stepdaughter he was babysitting before he went to work, because his

wife was at work that day.  Taylor then said if he asked Plaintiff to come in and work overtime,

he expected him to come work overtime.  (Pltf Dep 168:17-169:01)  Plaintiff does not know any

Caucasian employees that were questioned for not volunteering for that overtime.  (Pltf Dep

252:09-13)  Then Taylor complained about a mistake on the PM sheet—something Plaintiff

didn't annotate.  Plaintiff was sorry; didn't mean to miss that, and would do better.  (Pltf Dep

169:06-15)  Then Taylor said, After all this time, you went through orientation and learning the

computer system and you don't know how to figure out how to do paperwork on a PM?  Plaintiff

apologized and said he was trying to do better.  If he messed up, he messed up.  (Pltf Dep

169:17-170:01)  Then Taylor made another complaint were Plaintiff had done a PM, and based

on their standards, a Lead Tech is supposed to be checking over your PM once you're done, to

see if you missed anything.  (Pltf Dep 170:02-08)  It is important to note that this is further

pretext on the part of Defendant.  When it suits their purpose, management has repeatedly held

Plaintiff accountable for procedures or policies that mutate depending on the speaker and the

situation.  Mielke told Plaintiff that Stiltner was not supposed to help him on the starter job.

Plaintiff was supposed to have done it himself.  Stiltner was Plaintiff's Lead Tech.  He had been

busy at the time, and got Claybrooks to take his place.  Claybrooks looked at the truck and found

a steering arm was loose, and came and showed Plaintiff, who said, We'll annotate that on the

PM because it's his job to find out what Plaintiff missed.  (Pltf Dep 170:09-21)  The steering arm

is one of the things they're supposed to check on the PM.  (Pltf Dep 173:23-174:01)  In that

meeting, Taylor had three complaints about his performance.  (Pltf Dep 171:04-06)  They were

trumped up (the voluntary overtime that inexplicably became mandatory) or involved either a

human error (the loose steering arm) or a procedural omission of which Plaintiff had been

unaware (the missing annotation for the PM).  It would appear that Taylor, having first informed

Plaintiff his projected times were much better, then was determined to aggrandize minutia that

were not terminable offenses as he proceeded to present a laundry list of transgressions.

Plaintiff did not discuss his performance with Taylor again until May 17th.  He was

called back into the office by Kepler; Mielke also attended.  (Pltf Dep 174:20-175:10)  Kepler

had assigned Plaintiff a replacement starter in a truck.  He said it might be a bad starter.  The

truck wasn't in the shop; it was outside, parked against the fence, and when Plaintiff went out, it

wouldn't start.  He tried to see if there were some burned wires.  After about 30 minutes, he went

in and told Kepler he thought it was the starter, but couldn't really tell unless he got the truck in

the shop.  (Pltf Dep 175:20-176:14)  He spent 2 hours getting someone to help him tow the truck

into the shop, then dropped the starter and took it out.  He and another tech tested the starter and

found it was good.  (Pltf Dep 176:16-22)  Meanwhile, Kepler kept coming up saying Taylor

wanted to know why the starter's not been taken out yet.  (Pltf Dep 177:01-04)  Plaintiff told

Kepler he just got the truck in the shop, and asked why they were harassing him, to which Kepler

replied he was just doing what he's told.  (Pltf Dep 177:06-09)  After Plaintiff was disciplined

the first time, and then they complained in the first and second meetings, Plaintiff was frustrated because he felt it was ridiculous that he was being questioned a lot by his supervisor about his job performance.  (Pltf Dep 177:14-178:08)  About 10 minutes after he told Kepler he just got the truck in the shop, Kepler came back and said Mielke wanted to know why the truck wasn't being done.  Plaintiff told Kepler that was really starting to frustrate him.  It was getting to the point that Taylor and Mielke really were harassing him about this truck.  He had just gotten it in the shop.  (Pltf Dep 178:08-24)  They didn't have conversations directly with him; messages were sent from them to Kepler to him.  (Pltf Dep 178:25-179:09)  Kepler wasn't harassing him, he was doing his job as Shop Supervisor.  (Pltf Dep 179:17-21)

At some point during the May 17th meeting, Taylor brought up his performance on the starter.  (Pltf Dep 181:19-182:03)  He said that the projected time for the starter job last week was 3.9 hours, but you did it in over 9.  He asked Plaintiff to explain why it took so long.  (Pltf Dep 182:06-11)  Plaintiff said, How am I to know what the times are when the projected times are not even in the computer system, so I don't even know what the time was for that job.  (Pltf Dep 182:13-16)  Mielke replied, Well, I told you once, and I ain't going to tell you again.  Don't worry about projected times.  You just go ahead on and do your job.  (Pltf Dep 182:17-21)  Plaintiff said, Y'all are not telling me what the projected times are.  (Pltf Dep 182:24-25)  Mielke testified that in the May 17th meeting, they discussed that Plaintiff's performance had improved somewhat but not to their level of expectation of a Tech 2, and Mielke recommended a 15-day extension.  (Mielke Dep 15:18-24)  He does not recall whether Plaintiff expressed any disagreement with the 15-day extension or the PIP.  (Mielke Dep 16:05-08)  Once again, it is important to note the dichotomy that is Defendant's purported management philosophy:  in a meeting where Plaintiff was being denigrated by his supervisor's supervisor for taking too long

to do a starter job, the District Manager told him to not worry about projected times. This is the epitome of a Catch-22.

All the Tech 1s knew Defendant's projected times, because they'd been there longer. Plaintiff, as a new employee, was not familiar with the times. (Pltf Dep 183:12-20) There were other new techs that had also started after the times were no longer in the computer; they were not told the projected times, either. Plaintiff does not know the reason why. (Pltf Dep 183:21-184:09) He was told by Mielke at that first meeting, The reason we took it out is because we wanted to make sure y'all are not being governed by projected times, and we want y'all to be able to get the truck in, diagnose it, fix it, and get it out, so that way you're not slow working. (Pltf Dep 184:15-185:02) This was Plaintiff's adventure down the rabbit hole.

When it came down to diagnosing the starter job, bringing it in, and determining it didn't work, Plaintiff went to Kepler and said, The starter's good. Do you want me to put the new starter in or not? Kepler said to put the new starter in. They would just take that chance. (Pltf Dep 186:19-187:05) When Plaintiff put the new starter in, it didn't work, and he told Kepler there was something else wrong with the truck besides the starter. (Pltf Dep 197:07-11) In the meeting, Plaintiff told Taylor why it took 9 hours to complete the job. (Pltf Dep 187:12-14) First, the truck was outside. It was hard to work on it against the fence. It took all the time it took to tow it in; all the while, they tried to figure out what was wrong with the starter, whether it were bad or not, and he had to take the new starter back out and put the old starter back in. (Pltf Dep 187:18-188:06) He told Taylor that at that point, he went to talk with Stiltner, and told him it was not the starter: something else electrical was wrong with the truck. (Pltf Dep 188:07-14)

As Plaintiff was explaining this, Mielke said, Well, who is "we"? Plaintiff said Stiltner was assisting him in trying to find out what's wrong. Then Mielke said, Stiltner's not supposed

to be working on this with you.  You're supposed to be working on it by yourself.  (Pltf Dep 188:15-23)  Plaintiff said he had gotten to the point where he was lost, not knowing what was wrong with the truck, so he got assistance from Stiltner.  (Pltf Dep 188:24-189:03)  Mielke said, He's not supposed to help you.  I said you are supposed to have done this yourself.  (Pltf Dep 189:04-06)  Once again, the polarity that is Defendant's management style has evidenced itself.

Plaintiff had done a starter job at Ryder, and was able to do it in around 4 hours.  At that time, the truck was right there in the Ryder shop.  (Pltf Dep 191:04-10)  They didn't have to clock in on a particular job until you got it in the shop.  Ryder's standards were a whole lot different than at Defendant.  (Pltf Dep 191:19-25)

In the May 17th meeting, continuing Defendant's pattern of relentlessly besieging Plaintiff with supposed transgressions, they brought up that he replaced a mirror on a van, not knowing what the projected times were.  (Pltf Dep 194:07-14)  They said he spent roughly an hour on the mirror.  The projected time was 30 minutes.  He told them he got sidetracked again, helping another tech in the shop and not clocking off on that job.  (Pltf Dep 194:21-195:06)  He told Taylor and Mielke that he was helping the other tech; they said it wasn't acceptable to help other techs.  (Pltf Dep 195:07-22)

At that meeting, Plaintiff was given a memo that stated they were extending his PIP an additional 15 days.  (Ex 3 to Pltf Dep)  Defendant would monitor each area on a weekly basis during that time.  (Pltf Dep 197:06-09)  If immediate improvement was not attained, further disciplinary action up to and including termination would result.  (Pltf Dep 197:15-18)  Mielke told Plaintiff if he didn't improve within the next 15 days, they were just going to have to part ways.  Then he asked Plaintiff, Am I going to get 100 percent out of you?  And Plaintiff said he was not going to promise 100 percent, but would do the best he could.  However, he couldn't do

it if he didn't know the projected times.  (Pltf Dep 198:13-25)  Mielke said, I want 100 percent

out of you; then Plaintiff left.  (Pltf Dep 199:01-05)  Plaintiff found it offensive that Mielke said

he wanted 100 percent out of him.  (Pltf Dep 200:11-19)  At that point, Mielke was trying to

raise Plaintiff's standards a little bit too high.  As a tech—as a person—you can't put 100 percent

in a job because we're not perfect.  Mielke saying he wanted 100 percent was almost saying, I

want you to be perfect.  I want you to go ahead and get these projected times perfect and do them

100 percent.  (Pltf Dep 201:17-202:03)  Mielke put Plaintiff's standards up too high, and at that

point it became a little bit more fearful.

No one—Taylor or Mielke or Kepler or anybody—ever told him if he went over the time

on one more job, he was going to be terminated.  But they were pretty much saying that in the

job performance.  (Pltf Dep 205:05-13)  Plaintiff was intimidated.  Both of the disciplinary

actions (the PIPs) stated that the next step could be termination.  It was not a stretch for Plaintiff

to believe that the next job that took too long in Defendant's eyes (and it was a shell game,

because Plaintiff never <u>knew</u> the expected projected time) could have been his last.  Each time he

was called into a meeting with his superiors, he was verbally handed a new litany of offenses, of

which he had—to that point—been unaware.

Within that next 15-day period (Plaintiff's second PIP), Taylor assigned him to repair

brakes on a truck.  (Pltf Dep 207:03-09)  It was an old-style truck; the brakes had already been

taken off.  It needed some special brakes, and there were two sets of brakes sitting there.  (Pltf

Dep 207:17-22)  There were two different types of brake drums.  (Pltf Dep 210:17-23)  He put

one set on; they didn't fit.  (Pltf Dep 207:23-24).  They didn't go over the brake shoes at all, so

he took them off and addressed it with Taylor.  (Pltf Dep 211:05-10)  He asked what he should

do.  (Pltf Dep 207:25-208:02)  Taylor said, Put the brakes on the best you can.  Go ahead and

install them.  (Pltf Dep 209:20-210:07)  Taylor said the brakes were already there.  (Pltf Dep 210:14-16)  He said to take the first set off and put the old drums back on and park the truck and wait.  (Pltf Dep 211:23-212:01)  Plaintiff found another set of drums and put them on, and they fit fine, but he didn't want to just put them on and not know if they were the right drums.  (Pltf Dep 212:02-06)  When Plaintiff went to find Taylor, he had already left for the day.  (Pltf Dep 212:23-25)  Stiltner was Lead Tech in charge at that time, so Plaintiff told him about the two sets of drums:  the first didn't fit but the second fit pretty well.  He told Stiltner he was kind of scared; didn't want to put the wrong drums on.  Stiltner's exact words were:  Do the drums fit?  Plaintiff said, Yes.  (Pltf Dep 213:01-11)  Stiltner said, If they fit, put them on.  Plaintiff said, Are you sure you want me to put those brake drums on?  And Stiltner said, If they fit, put them on.  (Pltf Dep 214:03-07)  Afterward, Stiltner came out and looked at the work and said, How did the brake drums fit?  Plaintiff said, They fit fine.  Stiltner said, Well, maybe they were the right drums.  So Plaintiff put the truck back together and parked it.  (Pltf Dep 214:11-20)  That was May 22, and Plaintiff had Stiltner inspect the brakes Plaintiff installed.  He was Plaintiff's supervisor at that time.  (Pltf Dep 289:10:18)

Nobody told Plaintiff there was a problem and that the brakes overheated after the truck was released to the customer.  (Pltf Dep 216:11-15)  Taylor called him into the office that next Tuesday.  (Pltf Dep 217:24-25)  Jordan was also there.  (Pltf Dep 218:11-13)  Taylor said Plaintiff put the wrong brakes on the truck.  (Pltf Dep 218:16-17)  Plaintiff explained he talked to Stiltner, who said if the brakes fit, to put them on.  (Pltf Dep 219:16-21)  Taylor said that was not acceptable.  (Pltf Dep 220:01)  He was going to suspend Plaintiff until further investigation.  (Pltf Dep 220:08-09)  He didn't tell Plaintiff what he was going to investigate; just that there

would be further investigation.  (Pltf Dep 220:12-15) Taylor did not mention an accident involving the truck.  (Pltf Dep 221:02-06)

On May 24, Plaintiff called the shop trying to learn the outcome of the investigation. (Pltf Dep 222:22-25)  He talked to Jordan, who told him he was being terminated, and that he had a letter for him to come and pick up.  He could get his tool box, but was not allowed on the premises anymore.  (Pltf Dep 223:03-10)  Taylor never spoke to Plaintiff again.  (Pltf Dep 221:07-10)   Mielke had no further interaction with Plaintiff, either.  (Mielke Dep 18:11-13) Mielke testified that via conference call, they reviewed the data regarding the brake inspection along with the rest of the performance issues, and the decision was made to terminate.  (Mielke Dep 18:22-19:02)  It is important to note that this was only a week after telling Plaintiff that his times were somewhat improved, but they wanted to give it another 15 days.  It would seem that Mielke is proferring trumped-up charges.  There had been no further discussion about time overages; there was only the brake job.  Mielke's reference to "…the rest of the performance issues" is self-serving drivel.  Further, with regard to the brake issue, Mielke testified that he did not discuss the inspection or the installation with Kepler, Stiltner, Jordan, or Plaintiff.  He discussed it with only Taylor ((Mielke Dep 19:03-19)—the one individual who was not even on site when the job was done.  He left the shop for the day in the hands of Stiltner.  Mielke testified that there is no liability or responsibility placed upon the group leaders or the supervisors, the maintenance supervisors, to ensure that the work performed is adequate.  (Mielke Dep 20:02-06) Once again, it is painfully clear that Defendant had no system of checks and balances, no quality assurance, no quality control in place.  They left Plaintiff out to dry, with no accountability assigned to anyone higher up.

Jordan hand-delivered Taylor's letter terminating Plaintiff based on substandard performance. (Pltf Dep 222:07-20) He was terminated 6 days after having been put on his 15-day extended PIP. (Taylor Dep 19:23-25) Plaintiff thinks he was terminated because of his race. (Pltf Dep 225:18-19) He had been more concerned on trying to get the projected time based on those brakes, and felt if he didn't get them done at a certain point, he was going to get fired. (Pltf Dep 228:12-16) Of course, Plaintiff had been concerned about the time it took to do the brake job. He had been living under a guillotine threatening termination since working for Defendant less than a month. He could not seem to get his head above disciplinary water: with no warnings and no proffered assistance. Defendant seemed on a mission to set Plaintiff up to fail.

When it came to that meeting, they were trying to find a reason to get him out and that was based on his putting the wrong brakes on. (Pltf Dep 228:17-20) Mielke testified that Plaintiff was terminated because of performance-based issues: exceeding goal times; lack of abilities to perform repairs expected for a Tech 2 position. (Mielke Dep 07:18-24)

When Plaintiff left Taylor's office on being suspended, he went to talk to Nathan Bradford ("Bradford"), a Tech 3. (Pltf Dep 223:24-224:02) Bradford was hired 2 or 3 weeks after Plaintiff. At one point, Mielke and Taylor talked to Bradford about his times. (Pltf Dep 226:01-08) On May 22, when Plaintiff went to see Bradford, he asked if they disciplined him, and he said, No. (Pltf Dep 226:13-19) Subsequently, during a meeting with Bradford, Taylor asked if Bradford knew why they called him in. He said probably because of his times, and admitted they were not acceptable and he was going to do better. They didn't discipline him or write him up. (Taylor Dep 16:22-24) To his recollection, Bradford was never issued any sort of write-up or improvement plan. (Mielke Dep 20:07-17). Bradford, a Caucasian, was held to a different standard than was Plaintiff.

Before Plaintiff left that day, he told Bradford he would be back, because he needed to get his statement. (Pltf Dep 238:25-239:03) He came back around 9:00, showed Bradford both of his disciplinary actions, and asked, Did you or did you not get these disciplinary actions, and Bradford said he did not. (Pltf Dep 239:04-11) Plaintiff doesn't know of anyone else in that shop that ever got placed on a PIP. (Pltf Dep 239:22-240:02) Rodney Cox ("Cox") has been with Defendant for over 20 years. (Cox Dep 05:02-03) He is currently District Service Manager, but was District Operations Manager during Plaintiff's employ. (Cox Dep 05:04-11) Cox testified he has not seen any problems with discrimination or harassment (Cox Dep 07:13-15); yet he recalled a complaint of harassment or discrimination made by Claybrooks against Taylor. (Cox Dep 07:16-20) Taylor had made a cultural comment about hygiene. Claybrooks took offense to it and felt it was racially motivated. (Cox Dep 07:24-08:04) The issue was resolved after a meeting with Taylor, Mielke, Claybrooks, Cox, and James Gordon, the union steward at the time. (Cox Dep 08:17-24)

Plaintiff was put on a PIP versus a Caucasian male not being put on a PIP; Plaintiff took that as being discrimination. (Pltf Dep 245:21-25) When Plaintiff was being assigned two disciplinary actions and a Caucasian male hadn't been disciplined yet, that sounded racially motivated. If Mielke was in both of his meetings, and was in the meeting with Bradford, and didn't discipline Bradford, Plaintiff looks at it as being racial. (Pltf Dep 259:17-25)

Larry Howell, another Tech 1, around April or May, was assigned to a transmission: an 8- to 13-hour projected time. (Pltf Dep 246:02-07) The techs observed Howell take 3 to 4 days to replace the transmission. (Pltf Dep 246:13-15) Two or 3 days later, they were all sitting outside the shop before start of shift, and Brooks asked Howell if he got written up for that

transmission job.  Howell said, No, they just bitched me out.  (Pltf Dep246:17-24)  Howell did

not get put on a PIP like Plaintiff.  (Pltf Dep 247:17-18)

Taylor testified that he had meetings with Plaintiff between May 17 (the date of his

extended PIP) and May 24 (the date of his termination), but could not recall the date(s).  He

testified that they discussed Plaintiff going home until an investigation was completed on the

brake job he had performed.  (Taylor Dep 20:10-23)  There was only one meeting between May

17 and 24:  and that's when Plaintiff was suspended.  There was no further "discussion" of his

status, no attempt made to rectify or ameliorate the situation**.**  (Taylor Dep 20:24-21:01)

Paramount to Defendant's credibility—and equally indicative of the discriminatory fashion in

which they mismanaged Plaintiff's entire 2-month tenure as an employee—is the fact that Taylor

testified he <u>does not know</u> whether either Kepler or Stiltner inspected or otherwise supervised

Plaintiff's installation (Taylor Dep 21:24-22:02)  Further, Taylor testified that if Kepler or

Stiltner inspected those brakes and gave the okay for them to go out, they would not be subject to

discipline like Plaintiff was.  (Taylor Dep 22:14-17)  It is mind-boggling that Taylor's stated

reason for such was because, "Inspecting the brakes is not performing the job.  It's just

overseeing the job."  (Taylor Dep 23:06-08)  Taylor testified that he had disciplined Kepler in

the past over substandard job performance.  (Taylor Dep 23:12-20)  And the substandard

performance was, "…work not being completed that he was in charge of."  According to Taylor,

it was not a policy for a Lead Tech or a Maintenance Supervisor to inspect brake jobs or other

repairs done to vehicles before the vehicle goes out.  (Taylor Dep 22:06-09)  Taylor had to

discipline Kepler two to three times, informally, and once formally, due to work not being

completed in a timely manner.  (Taylor Dep 23:24-24:12)  Kepler no longer works for

Defendant.  (Taylor Dep 24:13-14)  Taylor does not know if he left or was terminated.  (Taylor

Dep 24:17-18)  Cox testified that Kepler resigned in lieu of termination.  (Cox Dep 11:21-22)

He was asked to resign due to his inability to perform his job:  lack of organization, skill,

direction, leadership.  (Cox Dep  12:06-11)  It is perhaps important to note that it was this stellar

employee of Defendant, to whom Plaintiff reported.

      Taylor had to discipline Stiltner two to three times, informally (Taylor Dep 24:21-24),

regarding his role as Lead Tech.  <u>He was not assisting on the floor as much as he should have</u>

<u>been.</u>  (Taylor Dep 25:03-08)  It is important to note that Mielke told Plaintiff that Stiltner was

not supposed to help him on the starter job.  Plaintiff was supposed to have done it himself.  (Pltf

Dep 189:04-06)  It would seem that Defendant either is not terribly clear on its managerial

practices, or is not being forthcoming.  How could Defendant possibly rationalize disciplining

Stiltner for not assisting on the floor, and then chastise Plaintiff for having Stiltner help him?

      Defendant would have the Court believe that there is no system of managerial checks and

balances, much less quality control, over vehicle repairs, before the vehicles are released.  This

flies in the face of reason.  Plaintiff had not yet done a brake job for Defendant.  As Taylor

himself testified, the only complaints to that point were regarding time issues—there was no

question of faulty work by Plaintiff.  He was terminated over the brake job, when his supervisor

inspected the job and allowed it to leave the shop.  Apparently, the only managerial

responsibility was adherence to allotted times.  When Cox was asked in deposition whether

Defendant had policies in place for supervisors to inspect or otherwise improve work performed

by the lower techs, he testified that generally, it's approved via what the techs come back to us

and say, Truck needs X.  That's generally the process we follow, or off of an annual inspection

sheet.  (Cox Dep 14:18-24)  Once again, Defendant apparently had no system of QC or QA,

whatsoever, other than monitoring times.

Taylor himself was demoted due to customer complaints about his job performance. (Taylor Dep 26:18-25) He claims to not know the composition of the customer complaints. (Taylor Dep 27:01-03) He does not recall whether he has ever had to apologize to another co-worker based on any co-worker complaints. (Taylor Dep 27:04-06) Three years ago, Claybrooks accused him of making racially motivated comments to employees or co-workers. (Taylor Dep 27:10-14; 17-18) Taylor claims to not remember what the comments were. (Taylor Dep 27:15-16) Taylor testified that he never apologized to Claybrooks for any comments. (Taylor Dep 27:19-21) It is important to note that Plaintiff testified that Claybrooks filed a grievance with the union based on his race. After that, Taylor apologized to him, and from that point on, couldn't really say anything racially to Claybrooks. (Pltf Dep 255:22-256:14) Taylor was perhaps not the most forthright of witnesses. He claims to have not handled Plaintiff's performance issues any differently than he handled any other employee's. (Taylor Dep 32:13-16) Clearly, to the contrary, the evidence speaks for itself.

Defendant claims that Plaintiff's belief that Bradford was treated differently is wholly speculative and not sufficient to survive Summary Judgment. (Def's Memo of Law, DE 18, 09/15/14, p. 6) Defendant cannot show that Plaintiff was consistently over his goal times from the beginning of his employment, nor can Defendant show that Plaintiff received verbal warnings prior to his PIP. Plaintiff can show that Bradford was over on his times. He knows Bradford's repair times for March of 2012. He got three of his ROs. (Pltf Dep 233:05-09) Plaintiff came back to the shop around 9:00, the day of his suspension, showed Bradford both of his disciplinary actions, and asked, Did you or did you not get these disciplinary actions, and Bradford said he did not. (Pltf Dep 239:04-11) Taylor himself testified that he never issued any formal discipline to Bradford—only informal discipline, over time standards. There clearly was

a double-standard when it came to time disciplines:  Plaintiff was dogged from the outset, after being given no information as to Penske's expectations; yet Bradford, a Caucasian, was only "informally" disciplined.

## II.  STANDARD OF REVIEW

Defendant as moving party has the initial burden of showing the Court, by reference to the record, the basis for the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the non-moving party has the burden of proof at trial, the movant must carry the initial burden in one of two ways: either by negating an essential element of the non-movant's case or by showing that there is no evidence to support a fact necessary to the non-movant's case.  *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 606-08 (11th Cir. 1991).  Bold, conclusory statements that the Plaintiffs cannot meet their burden at trial are insufficient.  Only after the movants have met their initial burden does the burden shift to the non-moving party to "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  929 F. 2d at 608.

Summary judgment is inappropriate unless the evidence is so one-sided that a reasonable jury could arrive at only one conclusion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  *Id.* at 255.  Under F.R.C.P. 56, the Court's role is narrowly limited to assessing the threshold issue of whether a genuine issue exists as to material facts requiring a trial.  *Id.* at 249.  "Summary judgment procedure is not a substitute for trial."  *Stone v. Hinds,* 541 S.W. 2d 598,599 (Tenn. Ct. App. 1976) Where disputed material facts exist, they are to be resolved by a trial on the merits. *Id.* As the Court evaluates the evidence, it must do so in the light most favorable to the nonmoving party and draw

all reasonable inferences in the Plaintiff's favor. *Stovall v. Clarke,* 113 S.W.3d 715, 721 (Tenn. 2003)

Reasonable inferences are inferences reasonably drawn from all facts then before the Court. Reasonable inferences are not necessarily more probably or likely than other inferences that might tilt in the moving party's favor. Instead, so long as more than one reasonable inference can be drawn, and that inference creates a genuine issue of material fact, the trier of fact is entitled to decide which inference to believe and summary judgment is not appropriate. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

### III.   ARGUMENT

### A.   Plaintiff Has Met the Burden of Proof to Establish a Discrimination Claim

Plaintiff may prove his case by direct evidence of discrimination or indirect evidence. The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both. If a plaintiff can produce direct evidence of discrimination then the *McDonnell Douglas* paradigm is of no consequence. An employer's discriminatory statements may form the basis for an inference of discrimination and establish pretext. *Ash v. Tyson*, 546 U.S. 454, 126 S.Ct. 1195 (2006). Furthermore, criticism of an employee's performance, even if true, which is linked to stereo types associated with plaintiff's membership in a protected class, falls precisely in the realm of the mixed motive analysis. *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), modified by *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, U.S 2003. Similarly, if a plaintiff attempts to prove its case using the *McDonnell Douglas* paradigm, then the party is not required to introduce direct evidence of discrimination. Under such a theory, plaintiff must prove that he was subjected to different treatment because of his membership in a protected category. While proof of disparate treatment may be by direct

evidence of discriminatory motive for the adverse action, such cases generally require indirect evidence from which an inference of discrimination may be drawn.

Under the *McDonnell Douglas* test, a plaintiff has the burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981). The burden of establishing a *prima facie* case is not onerous. *Id.* The case may be proven by showing that an employer took an adverse employment action under circumstances, which give rise to an inference of unlawful discrimination. *Beaver v. Commonwealth of Kentucky*, 783 F. 2d 672, 675 (6th Cir. 1986).

One of the more common ways available to satisfy the *McDonnell-Douglas* standard is to rely on showing that similarly situated employees not in the plaintiff's protected category were treated better or were not subjected to the same policy standards. Development of Sixth Circuit case law on similarly situated employees requires only that a plaintiff prove that all of the relevant aspects of his employment situation were similar to those of the comparable as not by the Sixth Circuit in *Ercegovich v. Goodyear Tire and Rubber Company,* 154 F.3d 344 (6th Cir. 1998):

> The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly situated; rather, as this court has held in *Pierce*, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects.

154 F.3d 344, 352 (6th Cir. 1998)

As such, the issue is whether Plaintiff's discipline and eventual termination were racially motivated. *Jones v. Continental Corporation, et al,*, 789 F.2d 1225 (1986).

**1.    Plaintiff was as qualified to perform his job duties as his white counterparts**

It is important to note that Defendant, having made a cursory review of Plaintiff's resume, apparently decided he was qualified for either job, as he was given his choice. Plaintiff did not offer the position(s) to himself. This was Defendant's decision, as it was also Defendant's decision to perform such a superficial review of Plaintiff's experience and qualifications. It is pretext to justify having terminated him because they neglected to scrutinize his suitability for their position.

Also no one questioned Plaintiff about any experience, during his interview. They didn't describe the duties of the position. The interview lasted about 10 minutes. He did not have to answer any substantive questions about the work he would be doing. No one asked him any questions to kind of test his knowledge as far as the Tech 2 or 3 positions. They didn't test his knowledge; nor did he fill out a written questionnaire with substantive questions about PM and how he would repair brakes or other parts of the car. It is particularly self-serving to cast aspersions on Plaintiff's abilities and then hold him accountable—after the fact—when no one at Defendant bothered to double check, probe, or even inquire as to his skill, talent, aptitude, competence, or proficiency, prior to offering him the position.

## 2. Plaintiff's white counterparts were not disciplined or terminated

"Exact comparators are often hard to come by, and whether any two employees are similarly situated often presents a question of fact for the jury." *Moore v. City of Clarksville*, 2011 U.S. Dist. LEXIS 78474 (M.D. Tenn. July 19, 2011)(*citing Hawn v. Exec. Jet Mgmt., Inc*., 615 F.3d 1151, 1157 (6th Cir. 2010) (ordinarily, the question of whether employees are similarly situated is for the jury to determine)); *Mandell v. County of Suffolk*., 316 F.3d 368, 379 (2nd Cir. 2003); (same); *George v. Leavitt*, 407 F.3d 405, 414, 366 U.S.

App. D.C. 11 (D.C. Cir. 2005) (same). "Whether the identified supervisors . . . are similarly situated to Bobo is a jury question."*Bobo v. UPS*, 665 F3d 741, 757 (6th Cir. 2012).

"The focus of the litigation is not on a comparison of 'the employment status of the plaintiff and other employees in every single aspect of their employment.'" *Id.* at 751 (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).  Rather, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Id.*; (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

Defendant claims that Plaintiff's belief that Bradford was treated differently is wholly speculative and not sufficient to survive Summary Judgment. Defendant cannot show that Plaintiff was consistently over his goal times from the beginning of his employment, nor can Defendant show that Plaintiff received verbal warnings prior to his PIP.  Plaintiff <u>can</u> show that Bradford was over on his times.  He knows Bradford's repair times for March of 2012.  He got three of his ROs.  Plaintiff came back to the shop around 9:00, the day of his suspension, showed Bradford both of his disciplinary actions, and asked, Did you or did you not get these disciplinary actions, and Bradford said he did not. Taylor himself testified that he never issued any formal discipline to Bradford—only informal discipline, over time standards.  There clearly was a <u>double-standard</u> when it came to time disciplines:  Plaintiff was dogged from the outset, after being given no information as to Penske's expectations; yet Bradford, a Caucasian, was only "informally" disciplined.  Defendant's arguments do not hold water.

And the discrimination continued even after he was no longer employed.  He got a call from Brooks, who said Bradford was assigned to do a starter job, the same job Plaintiff had done.

Brooks is a Tech 1. It took Bradford roughly 9 hours to do the starter job. After Bradford was done, he was very nervous, scared he was going to be terminated. He went to Taylor that next Monday and told him he was getting ready to quit. Mielke offered a different slant to the Bradford issue. He testified that Bradford stayed with them a very short time. Taylor had indicated to Mielke that Bradford's times were a little slow, but improving, and that he was having some type of concern over his family life. To his recollection, Bradford was never issued any sort of write-up or improvement plan. This clearly pinpoints the double standard. Plaintiff was given two improvement plans based <u>solely</u> on slow times. Bradford was given no formal discipline. Given this information, one would be hard-pressed to believe that Defendant could quantify its statement that Plaintiff's belief Bradford was treated differently is wholly speculative and not sufficient to survive Summary Judgment.

**B.    Defendant's Alleged Legitimate Non-Discriminatory Reason Was a Mere Pretext for Discrimination**

Once a *prima facie* case is established, Defendant has the burden of articulating a legitimate, non-discriminatory reason for taking its adverse employment action. If Defendant demonstrates such, Plaintiff then assumes the burden of showing that the reasons given by Defendant were a pretext for retaliation.

Accordingly, at this stage the burden shifts to Defendant, which must demonstrate a legitimate business reason justifying its action.

An employee may demonstrate that an employer's proffered, non- discriminatory reasons for an adverse employment action are pretextual by revealing the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation. Three of the most common ways to undermine an employer's proffered reasons include: (1) establishing that the proffered reasons have no basis in fact, (2) establishing that the proffered reasons did not

actually motivate the adverse employment action, or (3) establishing that the proffered reasons were insufficient to motivate the adverse employment action.

Pretext may be shown either directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of belief. *Smith v. Chrysler Corp.*, 155 F. 3d 799, 805-806 (6th Cir. 1998)  In other words, the plaintiff can establish pretext if the employer's stated reason for action had no basis in fact, did not actually motivate the decision, **or was never used in the past**. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000).

It is important to note that Plaintiff testified that the first meeting he had with Taylor <u>was</u> the April 10 meeting:  that there had been no earlier, "several" discussions about job performance, as purported by Taylor.  And the April 10 documentation is, in fact, a 30-day PIP. Plaintiff had only been hired by Defendant on or about March 12, 2012, less than a month before the PIP.

Paramount to Defendant's credibility—and equally indicative of the discriminatory fashion in which they mismanaged Plaintiff's entire 2-month tenure as an employee—is the fact that Taylor testified he <u>does not know</u> whether either Kepler or Stiltner inspected or otherwise supervised Plaintiff's installation (Taylor Dep 21:24-22:02)  Further, Taylor testified that if Kepler or Stiltner inspected those brakes and gave the okay for them to go out, they would not be subject to discipline like Plaintiff was.  (Taylor Dep 22:14-17)  It is mind-boggling that Taylor's stated reason for such was because, "Inspecting the brakes is not performing the job.  It's just overseeing the job."  (Taylor Dep 23:06-08)  Taylor testified that he had disciplined Kepler in the past over substandard job performance.  (Taylor Dep 23:12-20)  And the substandard performance was, "…work not being completed that he was in charge of."  According to Taylor,

it was not a policy for a Lead Tech or a Maintenance Supervisor to inspect brake jobs or other repairs done to vehicles before the vehicle goes out. (Taylor Dep 22:06-09) Taylor had to discipline Kepler two to three times, informally, and once formally, due to work not being completed in a timely manner. (Taylor Dep 23:24-24:12) Kepler no longer works for Defendant. (Taylor Dep 24:13-14) Taylor does not know if he left or was terminated. (Taylor Dep 24:17-18) Cox testified that Kepler resigned in lieu of termination. (Cox Dep 11:21-22) He was asked to resign due to his inability to perform his job: lack of organization, skill, direction, leadership. (Cox Dep 12:06-11) It is perhaps important to note that it was this stellar employee of Defendant, to whom Plaintiff reported.

Defendant would have the Court believe that there is no system of managerial checks and balances, much less quality control, over vehicle repairs, before the vehicles are released. This flies in the face of reason. Plaintiff had not yet done a brake job for Defendant. As Taylor himself testified, the only complaints to that point were regarding time issues—there was no question of faulty work by Plaintiff. He was terminated over the brake job, when his supervisor inspected the job and allowed it to leave the shop. Apparently, the only managerial responsibility was adherence to allotted times. When Cox was asked in deposition whether Defendant had policies in place for supervisors to inspect or otherwise improve work performed by the lower techs, he testified that generally, it's approved via what the techs come back to us and say, Truck needs X. That's generally the process we follow, or off of an annual inspection sheet. (Cox Dep 14:18-24) Once again, Defendant apparently had no system of QC or QA, whatsoever, other than monitoring times.

IV.  **CONCLUSION**

Considering the foregoing, Defendant has failed to show that its basis for requesting summary judgment is sufficient to deny Plaintiff a hearing upon the merits of his claims and as such, the Motion for Summary Judgment should be denied.

Respectfully submitted;

**ALLMAN & ASSOCIATES**

/s/ Andy L. Allman
Andy L. Allman, #17857
Jedidiah L. Cochran, #27158
103 Bluegrass Commons Blvd.
Hendersonville, Tennessee  37075
Telephone: (615) 824-3761 x203
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of October, 2014, a copy of the foregoing Response was filed via the Court's CM/ECF system and served via operation of the same upon the following:

Marcus M. Crider, Esq.
Brian A. Pierce, Esq.
Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
marcus.crider@wallerlaw.com
brian.pierce@wallerlaw.com

*Attorneys for Defendant*

/s/ Andy L. Allman